Carol **MARCELLA** and Timothy Marcella, H/W and Timothy Marcella, as Natural Guardian for Damon Marcella and Timothy Marcella as Natural Guardian for Eric Marcella

v.

**BRANDYWINE HOSPITAL** and **C.T. McChesney, M.D.** and **J.R. Monasterio, M.D.** and **Dr. Jose Cabria** and **Dr. John Caggiano** and **American Red Cross** and **Penn–Jersey American Red Cross Regional Blood Services** and **William C. Sherwood, M.D.**

Civ. A. No. 92–4207.

United States District Court, E.D. Pennsylvania.

Nov. 29, 1993.

Charles A. Klein, Richard P. Hackman, George W. Howard, III, Susan L. White, Robert J. O'Shea, Jr., George W. Howard, III, P.C., Philadelphia, PA, for plaintiffs.

Daniel J. Sherry, Marshall, Dennehy, Warner, Coleman & Goggin, Media, PA, for Brandywine Hosp.

Karl L. Stefan, O'Brien & Ryan, Plymouth Meeting, PA, for C.T. McChesney, M.D., J.R. Monasterio, M.D.

Andrew L. Braunfeld, Masterson, Braunfeld, Himsworth & Maguire, Norristown, PA, for Dr. John Caggiano.

John A. Guernsey, Howard M. Klein, Patricia M. Hamill, Louis S. Cali, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for American Red Cross.

Howard M. Klein and Louis S. Cali, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Penn–Jersey American Red Cross Regional Blood Service, William C. Sherwood, M.D.

John A. Saling, West Chester, PA, for Chester County Council On Addictive Diseases.

### ADJUDICATION

FULLAM, Senior District Judge.

Plaintiff Carol Marcella has become infected with HIV ("the AIDS virus") as a result of a blood transfusion, and has brought this action to recover damages. Her claims against the suppliers of the contaminated blood, the American Red Cross and its Penn–Jersey American Red Cross Regional Blood Services (for convenience, jointly referred to herein as "Red Cross") were severed and have been tried non-jury. The facts are not in substantial dispute, and may be summarized as follows:

Plaintiff Carol Marcella was seriously injured in an automobile accident on February 5, 1985, and was rushed to the Brandywine Hospital for emergency care. She received several blood transfusions. The unit she received at about 8 p.m. was later determined to have been contaminated with the AIDS virus. That unit had been donated on January 29, 1985, by a male homosexual referred to in these proceedings as "Donor X".

As a result of receiving the transfusion of Donor X's blood, Carol Marcella became infected with the AIDS virus. Although she has not developed full-blown AIDS, her prognosis is bleak. Persons whose T-cell blood count is less than 200 are considered to have full-blown AIDS. In healthy persons, the T-cell count is approximately 1200. Carol Marcella's most recent T-cell count was 400. She is being treated with AZT, and is suffering from the various side effects associated with that medication, including headaches, fatigue, nerve inflammation in her legs, anemia, and gastro-intestinal problems. She also suffers from various pulmonary-bronchial and dermatological problems, and severe emotional and psycho-social problems, including fear, frustration, depression and anger. She is, in short, the innocent victim of a devastating tragedy.

A test which makes it possible to determine whether a unit of blood is contaminated with the AIDS virus was approved by the

FDA on March 5, 1985—just one month after plaintiff's injury. Until that date, the test was being used only on an exploratory basis in laboratories; it had not been licensed or made available to the Red Cross, and could not lawfully have been used if it had been available. As soon as the test became available, the Red Cross fully utilized it, and sought to identify recipients of blood donated by persons whose blood later tested positive. In carrying out this program, which it called "Look Back," the Red Cross learned that a later blood donation made by Donor X on June 8, 1985, was contaminated with the HIV virus. Eventually, by November 11, 1986, it had been determined that Carol Marcella had received a unit of Donor X's blood from the January donation; on that date, Ms. Marcella was first informed of the possibility that she had received contaminated blood.

Donor X had contributed blood to the Red Cross on several occasions. As noted above, he gave blood on January 29, 1985, and again on June 8, 1985. When these donations occurred, Donor X was not aware that he was infected with HIV. He first became aware of his infection on May 8, 1993, after being contacted by the Red Cross and meeting with Dr. William Sherwood of that organization. Donor X was informed that the unit of blood he donated in June 1985 had been tested and found to be contaminated with HIV, and he was urged by Dr. Sherwood to undergo further testing and obtain appropriate medical treatment. But at the time Donor X testified at trial, on July 6, 1993, he had not taken any action to verify his condition or obtain treatment.

By agreement of the parties, Donor X testified *in camera*, without disclosure of his identity to counsel or the immediate participants. A Red Cross official not directly involved in the litigation had, pursuant to court order, disclosed the name and address of Donor X to the court *in camera*, and the court then invited him to appear and testify, under assurance of anonymity.

Donor X testified that, until the disclosure by Dr. Sherwood in May 1993, he did not know he had HIV, and had no reason to suspect that he might have become contaminated. As of January 29, 1985, the crucial date for purposes of this litigation, he had had no sexual contact with any other male for at least 18 months. Although he had little or no specific recollection of what questions he was asked and what information he supplied, in connection with the blood donation, he believed he had answered all questions truthfully. He has never used drugs. He did not consider himself to be a member of any group at high risk of AIDS. If he had known of his HIV contamination, he would not, of course, have donated blood.

## I.  DISCUSSION

This case is governed by Pennsylvania law. In Pennsylvania, by statute, the defendant Red Cross cannot be held liable as supplier of a product under *Restatement Torts,* § 402A, but only upon proof of causative negligence. 42 Pa.Cons.Stat.Ann. § 8333. The parties are in agreement that proof of negligence is required, but disagree as to whether the applicable standard of care is that of a "reasonable person," or the standard of care prevailing among blood banks, and generally accepted in that community as appropriate. While I believe it likely that the Pennsylvania Supreme Court would choose the latter standard, *see Seitzinger v. American Red Cross,* C.A. Nos. 90–46, 90–3890, 1992 WL 361700, 1992 U.S. Dist. LEXIS 18445 (E.D.Pa. Nov. 30, 1992), in the circumstances of this case there is no significant difference, and no difference in result.

The first step in analysis is to establish the prevailing state of medical knowledge about AIDS and its spread, at the pertinent times. Suffice it to say that, by late 1984, at least, and probably earlier, it was a matter of general knowledge in the medical field that AIDS was caused by a virus, HIV, and that it was communicated by transfers of certain bodily fluids. Specifically, it was known that AIDS could be transmitted through homosexual contact, injections using contaminated needles, and blood-transfusions. And there was a growing concomitant concern about the security of the nation's blood supply.

The concern over the blood supply was two-fold, involving, on the one hand, reducing or eliminating the risk that recipients of blood would become infected and, on the

other hand, avoiding reduction in available blood supplies through actions which might frighten or discourage potential donors. From the perspective of Red Cross and other volunteer blood banks, the task was to reduce the likelihood that contaminated blood would be donated, without generating a mistaken belief on the part of donors that they themselves might become infected by giving blood. The generally accepted solution, recommended by all the appropriate federal agencies and other organizations, was to identify "high-risk groups," and either refuse to accept blood donations from members of such groups, or quietly discard blood contributed by such groups. The definitions of these high-risk groups, and the best methods of screening, varied over time, as more information became available.

The Center for Disease Control publishes the *Morbidity and Mortality Weekly Report* ("MMWR"), containing information about communicable diseases and making recommendations for their treatment and prevention. On January 4, 1983, the Center for Disease Control held an open meeting including physicians and scientists representing the CDC, the Public Health Service, the Food and Drug Administration, the National Institutes of Health, the American Red Cross and the American Association of Blood Banks. On March 4, 1983, as an outgrowth of that conference, an inter-agency statement was published in the MMWR. That statement identified the high-risk groups for AIDS as sexually active homosexual or bisexual men with multiple partners, intravenous drug users, individuals who had recently entered the United States from Haiti, the sexual partners of homosexual and bi-sexual men with multiple partners, the sexual partners of IV drug users, and the sexual partners of individuals who had recently entered the United States from Haiti. It was recommended that all members of such groups should refrain from donating blood or plasma. It was further recommended that all blood banks use screening techniques to exclude all donors who are members of such groups and that further studies be conducted to evaluate the effectiveness of such screening techniques.

Both in those MMWR recommendations, and thereafter, care was taken to define the high-risk groups in terms of behaviors, rather than in terms of status. That is, it was felt necessary to avoid stigmatizing any particular group. Moreover, as of January 29, 1985 (and thereafter), the CDC did not recommend that prospective donors be questioned directly about their sexual orientation. The American Commission of Blood Banks was of a similar view. Indeed, Dr. Dennis Donohue, who was the director of blood and blood products for the FDA between 1983 and 1985, testified that he would not have approved the Red Cross' screening techniques if they had included direct questioning of donors concerning their sexual preference.

Instead of direct questions on these subjects, the blood banks, with the approval of FDA, provided prospective donors with written information defining the high-risk groups, and the donors were simply asked whether they were members of any such group.

Shortly after the March 4, 1983 recommendations were promulgated, the Penn–Jersey region of the Red Cross distributed instructions identifying the high-risk groups as all homosexual males, all intravenous drug users, and all Haitian immigrants, and instructing that all donors in those categories be excluded. This approach was adopted in the belief that excluding all homosexual men was preferable to asking intrusive questions about homosexual activity and the number of partners, and that the sanctity of the blood supply would best be preserved by simply excluding all gay and bi-sexual men from giving blood. This recommendation encountered a great deal of opposition, not only from the homosexual community at large, but also from persons active in AIDS work, including specifically the Philadelphia AIDS Task Force.

As a result of various meetings between Dr. Sherwood of the Red Cross and a Dr. Ifft of the Philadelphia AIDS Task Force, it was decided that excluding all homosexual and bi-sexual men would unduly antagonize members of the gay community, and might be counter-productive. The Red Cross was advised that any such blanket prohibition would

probably cause persons in that category to lie about their status, and might even cause persons with AIDS to deliberately retaliate against Red Cross by giving contaminated blood. The upshot was a combination of (1) attempting to exclude only on the basis of behaviors rather than status, and (2) a procedure enabling persons who had given blood to provide information in confidence which would result in making sure that their blood was not transfused. In the Penn–Jersey region, this "confidential unit exclusion" procedure took the form of a simple "call-back" procedure: donors were simply told that if, after giving blood, they had any questions, or doubts about the useability of their blood, they could telephone a specified Red Cross telephone number.

Throughout 1984, the donor instruction card used by the Penn Jersey Region identified the high-risk group for AIDS as "homosexual and bi-sexual males with multiple partners (more than one)". As of December 14, 1984, however, the FDA recommendations on the subject were changed, to define that high-risk group as homosexual and bisexual males having more than one partner at any time since 1979. The earlier donor card did not mention AIDS by name; and the instructional pamphlet informed prospective donors that AIDS could be contracted through sexual contact and "possibly" blood transfusions.

Unfortunately, at the time Donor X made the fatal January 29, 1985 donation, the defendant was still using the old cards and instructions, in the apparent belief that there was no need to comply with the December 14, 1984 amended recommendations until the existing supply of old literature had been exhausted.

Thus, assuming Donor X read the literature and accompanying documentation, he was informed that the high-risk group included homosexual males with multiple partners, rather than homosexual males who had had more than one sexual partner since 1979. Since Donor X had had no sexual partners at all for about 18 months, he was not aware of his high-risk group status.

Accordingly, if the appropriate standard of care is that applicable specifically to blood banks, the defendant violated that standard of care by not amending its procedures to conform to the December 14, 1984 FDA recommendation. If a more general standard of care is applicable, I conclude that, in addition to the failure to conform to the FDA recommendation, the defendant is properly chargeable with negligence for the unreasonable turgidity of its instructional materials. Given the then-prevailing state of medical knowledge, it seems obvious that the whole purpose of the screening procedure should have been to alert potential donors not to give blood if they were in a high-risk group for AIDS. Unfortunately, that crucial message was greatly diluted, and largely obscured, by being buried in the center of irrelevant textual material on other subjects. Moreover, although of no particular moment in this case because Donor X was a reasonably well-educated and sophisticated person (at least two years of college), the Red Cross brochure assumed a fairly high level of reading proficiency.

No useful purpose would be served, however, by further discussion of defendant's alleged shortcomings, because the evidence makes clear that, regardless of any negligence on the part of the defendant, such negligence did not cause plaintiff's injury. By the time Donor X made his second donation of blood in June 1985, all of the problems associated with defendant's conduct of the January 29 screening had been overcome: in June 1985, Donor X was correctly informed that the high-risk group included all male homosexuals who had had more than one sexual partner since 1979. And, although the brochure used in June 1985 is still arguably subject to criticism for requiring a rather high level of reading proficiency, it was plainly adequate to inform Donor X in all pertinent respects. But Donor X nevertheless continued in his belief that he was not a member of any high-risk group, and proceeded to donate blood. His perception that, since he had had no homosexual contact for more than 18 months, the warnings did not apply to him, remained unshaken. The only permissible conclusion, on this record, is that Donor X would not have been prevented from giving blood on January 29, 1985, even

if the defendant had dotted all the "i's" and crossed all the "t's".

Judgment must therefore be entered in favor of the defendant American Red Cross and Penn–Jersey American Red Cross Regional Blood Services, and Dr. William C. Sherwood.

### ORDER

AND NOW, this 29th day of November, 1993, it is ORDERED that:

Judgment is entered in favor of the defendants American Red Cross and Penn–Jersey American Red Cross Regional Blood Services and William C. Sherwood, M.D.; plaintiff's complaint is, as to those defendants, DISMISSED WITH PREJUDICE.